IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| HETHER MCCULLAR,<br><br>*Plaintiff,*<br><br>V.<br><br>CHARTER COMMUNICATIONS, INC.,<br><br>*Defendant.* | §<br>§<br>§<br>§  Civ. No. 5:19-cv-457<br>§<br>§  JURY DEMANDED<br>§<br>§<br>§ |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Hether McCullar ("Plaintiff" or "McCullar") files this Original Complaint against Defendant Charter Communications, Inc. ("Defendant" or "Charter"), and would show as follows:

## PARTIES

1. Plaintiff Hether McCullar is an individual residing in Bexar County, Texas.

2. Defendant Charter Communications, Inc. is a publicly traded corporation and may be served through its registered agent for service of process, Corporation Service Company, located at 211 E. 7th Street, Suite 620, Austin, Texas 78701.

## JURISDICTION AND VENUE

3. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, because Plaintiff is bringing suit pursuant to 18 U.S.C. § 1514A, the Sarbanes-Oxley Act ("SOX").

4. Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in the District.

## PROCEDURAL REQUISITES

5. All conditions precedent to filing this lawsuit have been met.

6. Plaintiff timely filed a complaint with the Occupational Safety and Health Administration ("OSHA") on November 2, 2018.

7. The Secretary of Labor has not issued a final decision within 180 days of Plaintiff filing her complaint with OSHA. Plaintiff has not caused any delay.

8. Pursuant to 29 C.F.R. 1980.114, Plaintiff brings this lawsuit for de novo review in an appropriate district court of the United States, which has jurisdiction over the action without regard to the amount in controversy.

9. Pursuant to 29 C.F.R. 1980.114(c), within seven days after filing this Complaint, Plaintiff will file with the Administrative Law Judge a copy of this file-stamped Complaint, and Plaintiff will also serve this Complaint on the OSHA official who issued the findings and/or preliminary order, the Assistant Secretary, and the Associate Solicitor, Division of Fair Labor Standards, U.S. Department of Labor.

## FACTS

10. McCullar was an employee of Charter and its predecessors, including Time Warner Cable, from approximately March 22, 2006 to approximately August 31, 2018. For many years, she worked under the Enterprise Sales division as a Strategic Account Executive, Enterprise Sales representative, which means she was responsible for selling Charter products to large businesses with over five hundred employees. Most recently, she specialized in selling Charter Ethernet fiber and Internet connectivity and wide area data networks. Throughout her tenure at Charter and Time Warner, she was an exemplary employee and received exceptional annual reviews and merit raises year after year. She was invited to attend nine "Achievers Cup" annual events, which rewards employees across the company for top sales and work ethics, and she earned over one hundred awards for her performance at Time Warner and Charter.

11. In approximately May 2016, Charter acquired Time Warner Cable and McCullar's leadership reporting structure changed. She reported directly to Mario Morata ("Morata"), her manager. McCullar's director was Michael Lammachia. Lynne Bell ("Bell"), Vice President for Strategic Sales, supervised the division.

A. **Both Internal Charter Rules and Securities Regulations Strictly Regulate When Business Can Be Considered "New."**

12. Charter's Spectrum Enterprise division maintains Sales Rules of Engagement ("ROE") that it requires its sales employees to follow. Among other Rules, the ROE distinguishes new customer accounts and existing customer accounts and requires that new customer accounts meet specific parameters. In addition to defining new and existing business, the ROE warns salespeople that they may not misclassify a sale or face discipline and possible termination.

13. As a Charter employee, McCullar understood that one of the reasons Charter strictly regulated the classifications of new sales and renewals was because Charter, as a publicly traded company, has a duty to its shareholders to accurately report new sales, renewals, and loss of revenue. McCullar understood that Charter shareholders rely on publicly available reports that Charter must file with the Securities and Exchange Commission and that sales misclassified as new opportunities that should properly be classified as renewals can impact shareholders' perception of the long-term health of Charter.

14. McCullar was also aware that Charter had been investigated by the Securities and Exchange Commission previously for misclassifying old and new business. She understood that the company had been found in violation of artificially inflating its subscriber growth numbers in the past, and that there was a similar investigation into Time Warner Cable at some point as well.

15. During her Charter employment, McCullar regularly read its quarterly and annual reports filed with the SEC. She noted that a unit of measurement Charter regularly includes in its

PLAINTIFF'S ORIGINAL SOX WHISTLEBLOWER COMPLAINT     3

reports on the health of the Enterprise section is "Enterprise PSUs," or primary service units. Enterprise PSUs represent the aggregate number of fiber service offerings, counting each separate service offering at each customer location as an individual PSU. In addition to falsely inflating new growth revenue, misclassifying existing business renewals as new business can lead to falsely inflated Enterprise PSUs, because customer locations and services would be double-counted. Charter's SEC filings regularly brag both about enterprise growth in terms of new review and new customers. For example, its First Quarter 2019 SEC filing notes, "Enterprise revenues increased $21 million during the three months ended March 31, 2019 compared to the corresponding period in 2018 primarily due to growth in customers. Enterprise PSUs increased 25,000 from March 31, 2018 to March 31, 2019."

16. In short, McCullar understood during her employment with Charter that misclassifying business renewals as new sales and misreporting revenue from Enterprise sales violated both Charter internal rules and also could violate the securities rules and regulations, and in particular could fraudulently lead shareholders to believe that Enterprise revenue and new business was stronger than it was.

**B.  When McCullar Observed Other Sales Employees Misclassifying Revenue and New Business, She Reported It to Her Supervisors As Potential Fraud.**

17. As a longtime Enterprise Sales employee, McCullar had many established clients. One of these clients was HEB Grocery. HEB was interested in eliminating Level 3 (which means that Charter worked with a telecommunications partner company to provide service, sometimes called a "last mile provider") at their grocery stores and replacing it with Spectrum fiber (which is a service provided directly to the customer by Charter) or choosing a new partner company for last mile connectivity instead of Level 3. Lynne Bell, Vice President for Strategic Sales, indicated to McCullar in approximately June 2017 that Bell was very concerned about the upcoming renewal

and HEB loss of revenue and that she would "need to figure out" how to "book a loss like that." McCullar spoke to Mark Holmes, Vice President of Decision Support/Business Planning, for advice on how to record the renewal and, in particular, how to record the transition of the HEB sites converting from type 2 partners like Level 3. Holmes informed McCullar in approximately 2017 that moving from Level 3 to Spectrum would not be treated as new business but instead be treated as a conversion and renewal, pursuant to the Rules of Engagement. Moreover, Holmes also informed McCullar that if HEB's new monthly rate was lower than its previous rate, it would be classified as a renewal and downgrade in revenue. Holmes explained to Bell that the entire HEB account was soon going to be a large write down in buisness.

18. In December 2017, before the HEB account alteration had taken place, Bell informed McCullar that Bell was removing HEB Grocery from McCullar's portfolio of accounts she sold and managed. All HEB accounts were transferred to Chris Kasper, Strategic Account Executive, and his manager Servando Perez, who were based in Austin, even though HEB is headquartered in San Antonio and there were other sales representatives in San Antonio who could have handled the account. On information and belief, Bell removed the HEB account from McCullar and the entire San Antonio office to make it easier for her to "book the loss" in a way more favorable to Charter.

19. On March 22, 2018, Kasper reported to Charter that he had completed several new sales to HEB. Bell approved these allegedly "new" sales in writing. Sales Science (which is the internal regulator of how sales orders are entered into Charter's systems) asked Morata, McCullar's manager, about the validity of these new sales. Morata asked McCullar to review the accounts Kasper listed and describe their status. McCullar reviewed the accounts and realized that, of the ten accounts Kasper listed, only one of them was properly considered as new revenue.

20. McCullar was immediately concerned that Kasper and Perez were misclassifying accounts as new revenue that should have properly been reported as *renewals* with a *downgrade* in revenue. Earlier in 2018, McCullar had attended a Charter regional sales meeting in which Ross Bopp, Senior Sales Leader for Business Development, warned sales employees not to misclassify renewals as new business because that could misrepresent Charter's sales numbers to the tune of multiple millions of dollars. Bopp mentioned to over 100 sales representatives, including McCullar, at this meeting that Charter was writing on average $4,000,000 in new business per month in 2017, and he was approving approximately $2,000,000 in credits that offset this new business each month. In other words, across the country half of Charter's reported new business is actually not new business at all. Because McCullar works on Enterprise accounts, a large amount of money is at stake for Charter and a misclassification can have a significant impact on the company's bottom line. For example, the HEB accounts as a whole are worth approximately $700,000 per month.

21. McCullar drafted and sent an email to Morata (her direct manager), Kasper, Perez, Lynne Bell, the Sales Science team, Barton Metcalf (interim Sales Director), and Daniel Jolley (on the Sales Science team), on March 22, 2018 at 8:07 p.m. McCullar then sent a follow up email with additional information at 9:09 p.m. For five of nine miscategorized accounts, McCullar noted that the claimed new order was actually a renewal and downgrade in revenue. For example, on one of the alleged new orders, McCullar wrote, "This is not a NEW order, rather a renewal and downgrade in revenue I was told by Mark Holmes in 2017."

22. Only one hour after McCullar sent the emails, Perez emailed Morata, that "Hether's facts are not up to do date and I do not appreciate her effort to undermine these orders publicly without a private discussion among the four of us. I will address Lynne [Bell] tomorrow since

these deals are new clean opportunities, regardless of her effort to improperly categorize and/or claim ownership. Also, I am left no choice but to express my frustration to Lynne at the lack of appreciation for our help getting the Warehouse Deal closed without any credit after multiple changes and proposals. We have significant air cover from Lynne and Richard . . . ."

23. Based on this response, McCullar was immediately concerned that Perez was threatening to retaliate against her for reporting her concerns about Perez and Kasper's fraudulent attempts to misclassify renewals as new business and to overreport business revenue. In particular, McCullar considered Perez's note about her alleged "lack of appreciation for [their] help getting the Warehouse Deal closed" to be a threat not to compensate McCullar for work she had performed helping Perez and Kasper on closing a new HEB sale installing fiber at numerous HEB warehouses. In addition, McCullar considered Perez's comment that he had "significant air cover from Lynne [Bell] and Richard [Twilley, Bell's boss]" to be an indication that Perez believed Bell and Twilley would side with Perez and against McCullar if she continued to pursue the issue.

24. McCullar forwarded the chain of emails to Dave Wilson, General Vice President for Sales Operations, and told him, "I will not deal with threats and retaliation for speaking the truth when asked by Sales Science." After Wilson informed McCullar that she would not face retaliation and that he was investigating her complaints, McCullar reported an additional concern that Kasper and Perez were attempting to manipulate the sales data by overstating revenue and misclassifying renewals as new business.

25. The next day, McCullar emailed Wilson and Mark Holmes, Vice President of Decision Support/Business Planning, to provide additional information about McCullar's concerns of sales misclassification. She notified them that, "Prior to my removal as the sales rep from HEB, I had in depth conversations with HEB in regards to eliminating Level 3 at their stores and

replacing those that we can build Spectrum fiber to with a direct connect circuit from Spectrum. My director, Michael Lamacchia, my VP, Lynne Bell, my manager, Mario Morata, our assigned CSM, Lisa Bartee, our Project Manager, Yvette Mandonado, the Sales Engineering group were all aware [of] HEB's desire to convert from Level 3 to Spectrum and more importantly Servando and Chris were aware . . . . I was also told that moving from Level 3 to Spectrum should not be treated as NEW business, rather be treated as a conversion and as a renewal . . . . ***In simple terms, I want no part in any fraud or in approving fraud*** and I was not going to lie to Sales Science, so I provided the details below." (Emphasis added.)

26. Charter immediately recognized that McCullar's complaints were significant. In response to Ms. McCullar's March 22 and 23, 2018 emails, Sales Operations Vice President Dave Wilson immediately asked Human Resources to investigate, noting that "If Hether's assertions are correct this is *flagrant example to mis-classify sales as NEW* for quota retirement and commissions." (Emphasis added). In turn, Charter's Senior HR Director noted that Ms. McCullar's complaint "describe[d] *concerning activity related to selling into our largest customer HEB*. . . . [W]e'd like your team's involvement . . . helping us to summarize and address what has now become a *pervasive issue – our (Austin) sales team's lack of adherence to our ROE and ethical guidelines*." (Emphasis added). Following an investigation, Charter concluded, "it was determined that the allegation regarding incorrectly processed sales was substantiated."

27. In the spring of 2018, McCullar also became aware that Kasper and Perez were attempting to falsify similar sales data regarding another client, Pedernales Electric Cooperative ("PEC"). Kasper and Perez classified a PEC sale as new revenue when it was simply replacing an older circuit and network, and as such should have been considered a renewal with a downgrade in revenue. On April 11, 2018, Morata called PEC and spoke to the client representative, Dennis

Hinson. Morata called Hinson from Charter's conference room, and Morata did not identify himself by name because he was concerned about retaliation. Morata asked Hinson whether PEC was intending to keep both the new circuits and the old ones and he informed Morata that he understood Charter was upgrading his circuits and upgrading his equipment. Morata asked Hinson whether he was expecting a bill for both the old circuits and the new circuits together. He told Morata "no," and that he understood that the older, more expensive circuit would be decommissioned after the upgraded circuits had been installed. In other words, although Perez and Kasper said that PEC was going to keep both sets of circuits, the customer never intended to do so and therefore Bell, Kasper, and Perez were fraudulently intending to increase Charter revenue numbers for their own benefit. McCullar helped Morata create an anonymous Gmail account, spectrumwatchtx@gmail.com, to report this information to Dave Wilson and other senior employees of Charter. This contract alone, which Charter booked as new revenue, was worth $2,500,000 over a five-year period.

C. **Following McCullar's Reports of Fraud, Her Email Was Searched, She Was Written Up for Invalid Reasons, and She Was Ultimately Terminated for Pretextual Reasons.**

28.   In early May 2018, shortly after McCullar and Morata emailed their concerns to Charter's ethics division, McCullar and Morata were summoned to a meeting with Lynne Bell and Human Resources Director Kristine Lawrence in Austin. Only one other sales employee was present at the meeting. Morata, the others sales employee, and McCullar were instructed that they should not contact Charter's ethics division under any circumstances and should instead bring any concerns they had to Bell and Lawrence. They did not mention McCullar and Morata's emails to ethics specifically, but McCullar understood that Bell and Lawrence suspected that McCullar had played a role in contacting ethics.

29. During this same meeting, Bell and Lawrence informed McCullar and Morata that they were aware that a Charter employee had made a phone call to Dennis Hinson, the PEC representative Morata spoke with on April 11, 2018. Bell and Lawrence noted that they had tracked the phone call to a San Antonio conference room, and that they were aware that a man had placed the phone call. When they said this, they looked right at Morata. They also noted that they were in the process of reviewing security footage of the conference room at the time of the phone call so they could identify the caller and discipline him. Morata has since been terminated by Charter.

30. Following this meeting, McCullar was very concerned that Lynne Bell—whose commissions, earnings, and ultimately her job depend significantly on whether the employees she supervises meet their new sales goals—was looking for a reason to terminate McCullar because she had reported fraudulent sales reporting.

31. Only one month later, in June 2018, Lynne Bell informed McCullar that she was being given a Final Warning for an alleged policy violation. Pursuant to Charter's progressive disciplinary policy, final written warnings are the last step before termination; in other words, Charter skipped several steps in its discipline policy in order to present McCullar with this discipline. McCullar had never been given any verbal or written warning or other discipline by either Time Warner or Charter before this on any subject. Bell sent McCullar the Corrective Action Report for her review, which explicitly linked the Final Warning to the fraud complaints McCullar made in March 2018. Specifically, the Warning noted, "In March 2018, you shared a concern with Sr. Leadership regarding how orders were being processed for one of your former customers. The concern was escalated to our Internal Audit dept. who assigned an investigator to research the allegations. Part of their investigative process is to review all electronic communication between all the named parties, including the employee who brought the concern forward."

32. The Corrective Action Report continued, "A review of your email resulted in a discovery of a picture of an African American basketball player with a racial slur across the top of the picture – see the attached photo. On 3/14/18, you emailed this photo from your work computer to your personal email address." McCullar immediately went through her email and located the email in question. On March 14, 2018, McCullar had forwarded an email from her work email to her personal email. There was no language in the body of the email, and the only content was the attachment. The attachment was a picture of McCullar's son in his high school basketball uniform that the family was using for college recruiting. McCullar is white, and her son is biracial. McCullar believes that Bell did not know her son is African American when she decided to issue the write up. McCullar does not use her work email for personal purposes, but she must have mistakenly used the wrong account when forwarding the email.

33. McCullar immediately forwarded the March 14 email to Bell and noted, "Please see the attachment, when I open it up on here, I don't see that verbiage either?" McCullar was referencing the Final Warning's allegation that the email contained a "racial slur." McCullar also forwarded the email to Morata, and he informed McCullar that he did not see a "racial slur" on the photo either. McCullar strongly denies using a racial slur in her work email or anywhere else, and she would certainly never call her own son a racial slur.

34. Shortly after informing Bell that the "African American basketball player" in question was her son and that the email McCullar forwarded had no racial slur contained within it, Bell informed McCullar that the Final Warning was being retracted. Bell told McCullar that she had no idea McCullar's son was African American or that he played basketball. On information and belief, Charter was searching McCullar's email for reasons to discipline or terminate her in retaliation for her complaints regarding fraud, and that when they found the March 14, 2018 email,

Bell believed she could use it as an excuse for disciplining McCullar. In fact, before Bell presented the original Final Written Warning to McCullar, she emailed Kristine Lawrence, "I will let [McCullar's] manager know she is now on FWW [Final Written Warning] once complete. I hunk [sic] that will be a *valuable message to that team*." (Emphasis added). Since no one other than McCullar and her supervisor, Morata, would know about private written discipline, Bell was apparently hoping that the two individuals warning Charter executives about fraudulent sales activity would get the "valuable message" to stay quiet or face future retaliation. However, as soon as Bell realized that the allegations were erroneous, she was forced to withdraw the warning and continue looking for another reason to terminate McCullar.

35. Only a few weeks after Bell informed McCullar that the Final Warning was being retracted, HR Director Kristine Lawrence called McCullar in late July 2018 to inform her that she was being placed on administrative leave. Lawrence informed McCullar that Lawrence was investigating a complaint made by manager Barton Metcalf regarding one of his employees, Nick Krasnowski, a sales employee who worked on renewals. It is important to note that McCullar copied Metcalf, who was then interim Sales Director and in the process of applying for the permanent position reporting directly to Bell with Bell's support, when she sent McCullar's initial complaint regarding Kasper's misclassification of sales on March 22, 2018.

36. Lawrence proceeded to explain to McCullar that Metcalf had spoken to Lynne Bell and they had decided to bring the concern to HR's attention. Lawrence told McCullar they were concerned that McCullar had partnered with Krasnowski on an "off the record" "split." A split, which refers to two sales employees working together on a sale and "splitting" the commission earned, is common within Charter and has been widely performed during McCullar's entire employment with Charter and Time Warner Cable. Krasnowski and Metcalf were apparently

complaining that the split McCullar was seeking compensation for had been done "off the record," which means that a sales employee does not record the split agreement with Charter. However, according to the Sales Rules of Engagement, it was Krasnowski and Metcalf's responsibility to ensure that the split was correctly recorded in Salesforce, not McCullar's. According to the Rules of Engagement, "The salesperson that closes the opportunity and his/her sales manager are responsible for ensuring the split process is properly completed in Salesforce."

37. Nevertheless, Lawrence informed McCullar that she was the one being placed on administrative leave for failing to record the sale. Krasnowski and Metcalf are still employed by Charter to date, even though they were the ones who violated Charter policy and not McCullar. Lawrence also informed McCullar that no one at Charter knew why McCullar was being placed on leave other than Lynne Bell, her direct supervisor Mario Morata, and Lawrence herself. Nevertheless, within one day of being placed on leave, numerous Charter employees contacted McCullar to let her know that Metcalf was telling numerous people that McCullar was going to be fired for failing to record her split agreement with Krasnowski. On information and belief, Lynne Bell informed Metcalf of McCullar's discipline in a further attempt to retaliate against McCullar for reporting sales fraud.

38. Or about August 10, 2018, while McCullar was still on administrative leave, the HEB warehouse deal, which was worth over $1.2 million, finally closed. This is the same deal McCullar was concerned Perez would attempt to deny her compensation on in retaliation for complaining about Perez and Kasper's fraudulent misclassification of sales. McCullar has not received any compensation for this deal to date, and on information and belief, Charter's failure to pay her commission on the HEB warehouse deal is a direct result of McCullar's complaints about Perez and Kasper's fraudulent misclassification of sales.

39. On August 31, 2018, McCullar participated in a conference call with Brian Malinowski, who is an HR employee, and Rick Brackeen, the new Sales Director who oversaw McCullar's sales group and reports directly to Bell. During this call, Malinowski terminated McCullar's employment with Charter. He informed McCullar that he had no details regarding why McCullar was terminated, but that the HR Director Lawrence requested that Malinowski call and fire McCullar. Brackeen also did not know why McCullar was fired and told McCullar he was brand new to the company and did not have any details either; he only knew that Bell had advised him the day before to call McCullar and fire her.

40. McCullar was terminated in retaliation for bringing concerns about shareholder fraud to the attention of Mark Holmes, Dave Wilson, Lynne Bell, and other individuals with supervisory authority over McCullar in violation of the whistleblower protections of the Sarbanes-Oxley Act. All of Charter's attempts to discipline McCullar since March 2018—and in particular the attempt to write her up for emailing a picture of her own son, her administrative leave for seeking compensation for a split, and her eventual termination—were all pretext for this retaliation.

## CAUSE OF ACTION
## 18 U.S.C. § 1514A(a)(1)(C):
## Retaliation Under the Sarbanes-Oxley Act ("SOX Retaliation")

41. Plaintiff incorporates by reference all of the allegations made in the preceding paragraphs.

42. Plaintiff engaged in activity protected by law. Specifically, she complained to her supervisors regarding conduct that she reasonably believed constituted securities and commodities fraud and federal law relating to fraud against shareholders.

43. Plaintiff's complaint was made in good faith.

44. Plaintiff reasonably believed that Charter was acting with a mental state embracing intent to deceive, manipulate, or defraud its shareholders.

45. Charter knew or suspected that Plaintiff engaged in the protected activity.

46. Plaintiff suffered adverse actions, including being placed on leave and eventually terminated.

47. Plaintiff's protected activity was a contributing factor in the adverse actions.

## ATTORNEYS FEES AND COSTS

48. Plaintiff is entitled to special damages sustained as a result of the discrimination alleged herein, including litigation costs, expert witness fees, and reasonable attorney fees under 18 U.S.C. § 1514A.

## DAMAGES

49. As a direct and proximate result of Defendant's actions, Plaintiff suffered injuries and damages and seeks the following:

   a. back pay, with interest;

   b. equitable relief, including but not limited to front pay and mental anguish compensation;

   c. reinstatement with the same seniority status that Plaintiff would have had, but for the discrimination;

   d. pre-judgment and post-judgment interest as provided by law;

   e. all costs of court; and

   f. any other relief to which Plaintiff may be entitled, whether in law or equity, including all relief necessary to make Plaintiff whole.

## JURY DEMAND

50. Pursuant to 29 C.F.R. 1980.114 and Rule 38 of the Federal Rules of Civil Procedure, Plaintiff requests a trial by jury on all issues.

## PRAYER

51. For these reasons, Plaintiff asks for judgment against Defendant for the following:

a. back pay, with interest;

b. equitable relief, including but not limited to front pay and mental anguish compensation;

c. reinstatement with the same seniority status that Plaintiff would have had, but for the discrimination;

d. pre-judgment and post-judgment interest as provided by law;

e. reasonable attorney's fees;

f. all costs of court; and

g. any other relief to which Plaintiff may be entitled, whether in law or equity, including all relief necessary to make Plaintiff whole.

Respectfully submitted,

/s/ Lawrence Morales II
Lawrence Morales II
ATTORNEY-IN-CHARGE
State Bar No. 24051077
Allison Sarah Hartry
State Bar No. 24083149
**THE MORALES FIRM, P.C.**
6243 IH 10 West, Suite 132
San Antonio, Texas 78201
Telephone No. (210) 225-0811
Facsimile No. (210) 225-0821
lawrence@themoralesfirm.com
ahartry@themoralesfirm.com
***ATTORNEYS FOR PLAINTIFF***